# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | |
|---|---|
| In re: | ) Bankruptcy No. 12-83168 |
|    Vista Marketing Group, Ltd., | ) |
|       Debtor. | ) Chapter 7 |
| BMO Harris Bank, N.A., f/k/a Harris N.A., as | ) |
| the assignee of the Federal Deposit Insurance | ) |
| Corporation as the receiver for Amcore Bank, | ) |
| N.A., | ) |
|       Plaintiff | ) Adversary No. 14-96013 |
| | ) |
| v. | ) |
| | ) |
| Vista Marketing Group, Ltd., | ) Judge Lynch |
| State of Illinois, | ) |
| Stenstrom Petroleum Services Group, | ) |
| Illinois Dept. of Revenue, | ) |
| N.L. Stevens, III, | ) |
| S. Kinnie Smith, Jr., | ) |
| Kelley Williamson Company, | ) |
| James Stevens, | ) |
| Thomas Laughlin, | ) |
|       Defendants. | ) |
| Illinois Dept. of Revenue, | ) |
|       Counter/ Cross Claimant | ) |
| v. | ) |
| | ) |
| BMO Harris Bank, N.A., f/k/a Harris N.A., as | ) |
| the assignee of the Federal Deposit Insurance | ) |
| Corporation as the receiver for Amcore Bank, | ) |
| N.A., | ) |
|       Counter-Defendant, and | ) |
| | ) |
| Vista Marketing Group, Ltd., | ) |
| Stenstrom Petroleum Services Group, | ) |
| N.L. Stevens, III, | ) |
| S. Kinnie Smith, Jr., | ) |
| James Stevens, | ) |
|       Cross-Defendants. | ) |

## MEMORANDUM OPINION

In this Adversary Proceeding BMO Harris Bank, N.A. seeks a determination that it is entitled to $313,950.46 in net sales proceeds from the sale of two gas stations

owned and operated by the Debtor. BMO Harris now moves for summary judgment on its claims. The Illinois Department of Revenue ("IDOR") seeks summary judgment on its counterclaim for a determination that its interests in the gas station properties are superior to those of the other interested parties. Because the court finds there is no genuine issue of material fact and as a matter of law that BMO Harris' interest in the proceeds is superior to the only non-defaulting defendants, the State of Illinois and the Illinois Department of Revenue, summary judgment will be entered in favor of BMO Harris.

## FACTS AND BACKGROUND[1]

The Motions to Sell

The Debtor, Vista Marketing Group, Ltd., filed a voluntary petition under Chapter 11 on August 30, 2012. As of the petition date, the Debtor owned and operated three retail gas stations in the Rockford area. On January 3, 2013, the court granted the Debtor's motion to sell two of the stations pursuant to a sale agreement, which was "approved in all respects,"[2] between the Debtor as seller and Kelley Williamson Co. as purchaser. (Order Granting Mot. to Sell, Case No. 12-B-83168, ECF No. 69.) The sale order approved the sale of the station at 5542 East Riverside Boulevard (the "Riverside Property") for $2,820,000.00 and the station at 1021 Meridian Road (the "Meridian Property") for $900,000. Under the terms of the sale order, the sale was to be "free and clear of all liens with all liens to attach to the proceeds pursuant to 11 U.S.C. §363." The sale order further provided that:

> As to the Property commonly known as 1021 Meridian Road, the Debtor is authorized and directed to pay all net proceeds, after the payment of all normal and customary closing costs, including payment of past due and accrued real estate taxes, to BMO Harris Bank, N.A. in partial satisfaction of its perfected mortgages on the real estate and first and perfected security interest in the personal property being sold. As to the proceeds from the sale of the real estate commonly known as 5542 E. Riverside Boulevard and related personal property, the Debtor is authorized and directed to pay all net proceeds, after the payment of all

---

[1] The following sets forth the court's findings of fact as required by Fed. R. Bankr. P. 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

[2] On December 19, 2012, the court entered an order lifting the automatic stay as to secured creditor BMO Harris Bank, N.A., with respect to the third gas station located at 6874 Weaver Road. (Order Lifting Automatic Stay, Case No. 12-B-83168, ECF No. 62.)

> normal and customary closing costs, including payment of past due and
> accrued real estate taxes, first to BMO Harris Bank, N.A. in the amount
> necessary to satisfy all amounts due on its first mortgage on the Property
> commonly known as 5542 E. Riverside Boulevard. Next, the Debtor is
> authorized and directed to pay such amounts as are necessary to satisfy
> the second mortgage of Rockford Local Development Corporation.  All
> remaining proceeds from the sale of the Riverside Property, with all liens,
> claims, encumbrances and other interest into and against those remaining
> proceeds to attach thereto are to be held subject to further order of the
> Bankruptcy Court.

(*Id.*)

Creditor BMO Harris initially objected to the motions to sell.  The original motions stated that approval of the sale "would pay off all liens on said property and, by virtue of paying off liens filed on behalf of the Illinois Department of Revenue for unpaid retailer's occupation taxes, would also serve to remove such liens from other real estate owned by the Debtor." (Mot. to Sell Meridian Prop. ¶ 6, Case No. 12-B-83168, ECF No. 43; Mot. to Sell Riverside Prop. ¶ 6, Case No. 12-B-83168, ECF No. 44.) The original proposed orders attached to the motions provided for payment not only of real estate taxes but also payment of "any other taxes related to the sale of the property." (Mot. to Sell Meridian Prop., ECF No. 43; Mot. to Sell Riverside Prop., ECF No. 44.) However, BMO Harris objected to the motion to sell the Riverside Property as originally proposed, specifically opposing any payment to IDOR. (BMO Obj., ECF No. 54.)  BMO Harris objected that IDOR had not recorded any notices of liens on the Riverside Property prior to the time the bank recorded its mortgages or extended its loans and that the sale proceeds were not enough to pay off the Debtor's debt to BMO Harris under four promissory notes secured by properly recorded mortgages in the two properties.  Thus, BMO Harris asserted that the sale order should provide for payment to: "1) BMO Harris Bank all amounts due under Note 4; 2) all amounts due and owing to the U.S. Small Business Administration and the Rockford Local Development Corporation; and 3) all remaining proceeds to BMO Harris Bank under Notes 1, 2, and 3."

Ultimately, the parties agreed on the form of the order that was ultimately entered by this court.  It provided for payment from the Riverside Property proceeds first to BMO Harris on its first mortgage, next to the Rockford Local Development

Corporation on its second mortgage, and all remaining proceeds to be held subject to court order with all liens, claims, encumbrances and other interests to attach to the remaining proceeds. (Order Granting Mot. to Sell, ECF No. 69.) Although the agreed order provided for deferral of the adjudication of rights in the remaining proceeds, IDOR does not allege that it participated in the negotiations over the terms of the sale order, which made no reference to IDOR or to retailer occupation taxes.

The motions to approve the sale were served on the Illinois Department of Revenue on November 21, 2012, more than 21 days before the initial hearing on December 19, 2012. (Mot. to Sell Meridian Prop., ECF No. 43; Mot. to Sell Riverside Prop., ECF No. 44.) Neither the Illinois Department of Revenue nor the State of Illinois objected to the motion or sale, nor have they appealed the sale order. According to the docket and claims registry IDOR's first active participation in the bankruptcy case was to file a proof of claim on February 4, 2013. (Claim No. 13-1.) IDOR first appeared in the case when it filed its response to the purchaser's motion for rule to show cause against it on March 27, 2013. (IDOR Resp., ECF No. 93.)

Pursuant to this court's sale order, the Riverside and Meridian Properties were sold to Kelley Williamson Co. on January 31, 2013. (*Id.* ¶ 26.) The Riverside Property was sold for $2,820,000.00 for the real estate and $39,391.28 for fuel and convenience store inventory. (*Id.* ¶ 32, Ex. J.) Out of these proceeds, the first of four promissory notes in favor of BMO Harris was paid in full for $2,063,812.86 and a loan from the U.S. Small Business Administration or Rockford Local Development Corporation loan was paid off for $318,183.35. After paying outstanding property taxes and utilities for the property and closing costs, the remaining $303,151.49 in proceeds was paid to the Debtor's attorney to be held in escrow. The Meridian Property was sold for $900,000.00 for the real estate and $10,738.97 for fuel and convenience store inventory. The real estate price proceeds were used for closing costs, to pay outstanding property taxes and to pay down the remaining debt owed to BMO Harris by $869,868.27. Although the sale order provided that all net proceeds from the sale of the Meridian Property were to be paid to BMO Harris, the $10,738.97 inventory proceeds were paid to the Debtor's

attorney to be held in escrow. (*Id.*)[3] As discussed below, while both the IDOR and the State of Illinois claim they are entitled to all or a portion of the $303,211.49 in net proceeds held in escrow from the sale of the Riverside Property, neither asserts a claim to the other proceeds paid to BMO Harris or other claimants under the sale order or to the $10,738.97 in sale proceeds attributable to the Meridian Property fuel inventory. (*See* IDOR Mem. of Law 4, ECF No. 71 (IDOR agrees that fuel proceeds from sale of Meridian Property were "erroneously held" in escrow); Ill. Am. Resp., ECF No. 66 (State of Illinois asserts an interest only in proceeds of Riverside Property).)

<u>BMO Harris' Pre-Sale Mortgage Liens on the Riverside and Meridian Properties</u>

Both the State of Illinois and the IDOR concede that as of the time of the sale of the Riverside and Meridian properties to Kelley Williamson, BMO Harris held valid mortgages in both properties. (Ill. Resp. ¶¶ 9, 10, ECF No. 53; IDOR Resp. ¶¶ 9, 10, ECF No. 70.) Specifically, BMO Harris' predecessor in interest lent the Debtor money in four transactions between 2007 and 2009, secured by mortgages in the Riverside or Meridian Properties.

In February 2007, BMO Harris' predecessor lent the Debtor $2,335,811.00 (the "2007 Note"). (*Id.* ¶ 8.) On or about that date the Debtor granted the lender a mortgage in the Riverside Property, which was recorded with the Winnebago County Recorder on February 12, 2007 (the "2007 Riverside Mortgage"). (*Id.* ¶ 9.) The 2007 Riverside Mortgage secured "all obligations, debts and liabilities, plus interest thereon" of the Debtor to the lender as well as all claims by the lender against the Debtor "whether now existing or hereafter arising" including "all future advances made by" lender to the Debtor. However, the Riverside Mortgage had an express maximum lien amount of $2,335,811.00. (*Id.* ¶ 9; BMO Mot. for Summ. J., ECF No. 50, Ex. E.)

Subsequent to the 2007 Riverside Mortgage, either the U.S. Small Business Administration or the Rockford Local Development Corporation lent funds secured by a mortgage against the Riverside Property that was recorded on October 31, 2007. (Ill.

---

[3] The figures listed in the closing statements as paid to the Debtor's counsel in escrow, $303,151.49 and $10,738.97, add up to $313,890.46, but the parties acknowledge and agree that $313,950.46 in proceeds are currently held between BMO Harris' counsel and Debtor's counsel. (BMO Mot. for Summ. J. ¶ 34, ECF No. 50; Ill. Resp. ¶ 34, ECF No. 53; IDOR Resp. ¶ 34, ECF No. 70.) The sum of $157,005.23 remains in Thomas Laughlin's trust account, and the sum of $156,945.23 is held in Hinshaw & Culbertson LLP's trust account. (IDOR Resp. ¶ 38, ECF No. 70.)

Resp. ¶ 29, ECF No. 53; IDOR Resp. ¶ 29, ECF No. 70.)

BMO Harris' predecessor lent the Debtor an additional $350,000 on May 7, 2008 (the "2008 Note"), $435,000 on March 13, 2009 (the "March 2009 Note") and $2,925,221 on December 14, 2009 (the "December 2009 Note"). (*Id.* ¶¶ 5, 6, 7.)

The Debtor granted BMO Harris' predecessor an additional mortgage in the Riverside Property with a maximum lien of $3,466,402.00. This additional mortgage dated May 7, 2008 was recorded on May 9, 2008 (the "2008 Riverside Mortgage"). (*Id.* ¶ 9, Ex. E.) The 2008 Riverside Mortgage included a cross-collateralization clause similar to the 2007 Riverside Mortgage. The 2007 Riverside Mortgage was modified to increase the maximum lien amount to $3,560,221.00 pursuant to a modification dated December 14, 2009 and recorded on January 11, 2010. The Debtor also granted BMO Harris' predecessor two mortgages in the Meridian Property which also included cross-collateralization clauses similar to the 2007 Riverside Mortgage. (*Id.* ¶ 10, Ex. F.) The first was a mortgage on the Meridian Property dated May 7, 2008 and recorded with the Winnebago County Recorder on May 9, 2008 with a maximum lien amount of $635,000. The second was a mortgage on both the Meridian Property and the Weaver Property, dated May 7, 2008 and recorded with the Winnebago County Recorder on May 13, 2008 with a maximum lien amount of $2,831,402.00, which was later increased to $2,925,221.00 pursuant to a modification dated December 14, 2009 and recorded January 25, 2010. (*Id.*)

The four promissory notes were also secured by a security interest in the business assets of the Debtor, including, but not limited to, the accounts, equipment, general intangibles, and inventory, under a Commercial Security Agreement dated August 28, 2007. (*Id.* ¶ 11.) This security agreement included a cross-collateralization and future advance clause and was perfected by a UCC-1 Financing Statement filed with the Delaware Secretary of State on April 28, 2004. (*Id.* ¶¶ 11, 12.)

As of September 29, 2011, only BMO Harris, the U.S. Small Business Administration and the Rockford Local Development Corporation had recorded any lien against the Riverside Property.

On December 19, 2012, this court lifted the automatic stay for BMO Harris to continue its foreclosure proceeding against the Weaver Property in Winnebago County,

Illinois. (Order Lifting Automatic Stay, ECF No. 62; BMO Mot. for Summ. J., ECF No. 50, Ex. O.) The state court determined that after the application of the proceeds from the sale of the Weaver Property, the Debtor still owed to BMO Harris $2,658,693.85 as of May 30, 2013. The deficiency after sale of the Riverside, Meridian and Weaver Properties is further supported by BMO Harris' proof of claim for $2,658,693.85 filed on May 1, 2013. Neither the IDOR nor the State of Illinois objected to that proof of claim. (Ill. Resp. ¶¶ 39-41, ECF No. 53; IDOR Resp. ¶¶ 39-41, ECF No. 70.)[4] On or about August 21, 2013, BMO Harris received $1,200,798.55 in connection with the sale of the remaining collateral for the 2007 Note, 2008 Note, March 2009 Note and December 2009 Note, leaving a deficiency of at least $1,457,895.30. (Ill. Resp. ¶ 46, ECF No. 53; IDOR Resp. ¶ 46, ECF No. 70.)

### Claims of the State of Illinois and IDOR

Subsequent to the sale of the Riverside and Meridian Properties, the IDOR filed a proof of claim on February 4, 2013, for $707,109.60 for pre-petition sales and use taxes of the Debtor in 2011 and 2012. (Claim No. 13-1.) Of this, IDOR asserts $242,142.20 as a priority unsecured claim and $440,278.18 as a secured claim. (*Id.*) The department attached a copy of a notice of tax lien purportedly recorded with the Winnebago County Recorder on April 26, 2012. On April 9, 2013, IDOR filed a second proof of claim for $989,635.31 for pre-petition motor fuel taxes between 2010 and 2011. (Claim No. 14-1.) It asserts this claim is unsecured, but states that $887,326.70 is entitled to priority treatment. (*Id.*)

The State of Illinois filed a proof of claim on May 1, 2013 for $61,741.88 for unpaid estate taxes. (Claim No. 15-1.) The state asserts the entire amount of the claim is secured by a statutory lien in $313,000 in "[p]roperty, or proceeds from sale of property, subject to Illinois Estate Tax statutory lien." (*Id.*) Although the basis for the state's asserted interest is not clear from its proof of claim, the state now states that it believes that the Riverside Property or some portion of it constitute proceeds of property from the estate of Lois Williams, who died on August 5, 1999. (*See* Ill. Resp.,

---

[4] The State of Illinois did not controvert and is therefore deemed to have admitted BMO Harris' statements of fact describing its deficiency claim. (Ill. Suppl. Resp. ¶ 40, ECF No. 67.) IDOR did not dispute BMO Harris' claim for a deficiency, but only denied "that BMO Harris has a lien on the funds to the extent that they represent consideration paid so that the purchaser of the Meridian and Riverside Properties would be free and clear of IDOR's interest." (IDOR Resp. ¶ 40, ECF No. 70.)

ECF No. 53; Ill. Am. Resp., ECF No. 66.) The state contends that it had a statutory lien in property of the Lois Williams estate to secure unpaid estate taxes, and that such lien attached to the Riverside Property and to the proceeds of sale of that property. To date, the State of Illinois has been unable to elaborate precisely what property of the Williams estate it alleges to have been converted into the Riverside Property or any other theory why the Riverside Property would constitute proceeds of property of the Williams estate. (*Id.*)

<u>Procedural History of the Adversary Proceeding and Opportunity for Discovery</u>

BMO Harris initially sought a determination that it was entitled to the escrowed sales proceeds by filing a motion to compel turnover. IDOR, the State of Illinois and several other parties filed objections, and this court ultimately denied the motion without prejudice on July 15, 2013, as a matter more appropriately brought as an adversary proceeding. (Order Denying Turnover, Case No. 12-B-833168, ECF No. 144.) *See* Fed. R. Bankr. P. 7001.

On August 13, 2013, Debtor's counsel sought leave to transfer $156,945.23 of the $313,950.46 to BMO Harris' counsel to be held in escrow and on the same terms as under the sale order entered on January 3, 2013, so that the amount held in escrow would not exceed the insurance coverage limits set by the FDIC for depository accounts. The motion was granted on August 21, 2013.

On January 30, 2014, BMO Harris commenced this adversary proceeding, seeking a declaration that it is entitled to the full $313,950.46 in sale proceeds held by Debtor's and BMO Harris' counsel, and for the proceeds to be turned over to BMO Harris.[5] BMO Harris named as defendants the State of Illinois, Illinois Department of Revenue, and several other parties with potential interests in the proceeds. The Debtor's bankruptcy case was converted to Chapter 7 on February 5, 2014, and on April 21, 2014, BMO Harris amended its complaint to add the Chapter 7 Trustee and the Debtor's counsel as defendants.

On July 1, 2014, IDOR answered the amended complaint and filed its

---

[5] The Amended Adversary Complaint is divided into two counts, with the first count seeking turnover of the proceeds from the sale of the Meridian Property and associated fuel inventory, and the second count seeking turnover of the proceeds from the sale of the Riverside Property and associated fuel inventory. (Am. Compl., ECF No. 26.)

counterclaim against BMO Harris and crossclaim against the Debtor, Stenstrom Petroleum Services Group, N.L. Stevens, III, S. Kinnie Smith, Jr., and James Stevens in his capacity as Ch. 7 Trustee. (IDOR Answer to Am. Compl., ECF No. 36.) The counterclaim alleged that IDOR has a right to the escrowed fund prior to any other party. BMO Harris answered the counterclaim on July 18, 2014.[6] (BMO Answer to Countercl., ECF No. 39.) The Debtor, Stenstrom Petroleum Services Group, N.L. Stevens, III, S. Kinnie Smith, Jr. and James Stevens in his capacity as Chapter 7 Trustee were each held in default with respect to IDOR's cross claims on February 25, 2015. (Order Granting Mot. for Default, ECF No. 72.)

At the status hearing on August 25, 2014, the State of Illinois indicated it wished to take discovery. Although the matter was continued to enable the parties to do so, it appears that only the State of Illinois availed itself of this opportunity. Before briefing on the summary judgment motions closed in 2015, BMO Harris, IDOR and the State of Illinois confirmed that they did not need to take further discovery.

On October 8, 2014, BMO Harris filed the pending motion for summary judgment, together with its statement of material facts, memorandum in support and other supporting documents. The creditor's motion sought summary judgment on both counts of its complaint as well as on IDOR's counterclaim. (BMO Mot. for Summ. J., ECF No. 50; BMO Stmt., ECF No. 51; BMO Mem., ECF. No. 58.)

On October 20, 2014, the State of Illinois filed a response to the motion for summary judgment, attaching an affidavit of Rosalie Lowery, the Springfield bureau chief of the Illinois Attorney General's Revenue Litigation Office. In the affidavit, notarized on October 20, 2014, Ms. Lowery stated that on an unspecified date in April

---

[6] The State of Illinois filed an answer to the original complaint on March 3, 2014. (Ill. Answer, ECF No. 11.) An order was entered on September 12, 2014 deeming the state's answer to the original complaint to stand as an answer to the amended complaint. (Order Granting Mot. for Default, ECF No. 49.) BMO Harris and Kelley Williamson filed a stipulation for dismissal of Kelley Williamson on June 27, 2014, (Agreed Stip. for Dismissal, ECF No. 34), which was effectuated by an order dismissing Kelley Williamson as a defendant on April 22, 2015. (Order Dismissing Kelley Williamson Co., ECF No. 91.) Attorney Laughlin, who stipulated that he made no claim to the escrowed funds, was dismissed by stipulated order on July 17, 2014. (Stip. Order Dismissing Thomas Laughlin, ECF No. 38.) The Debtor, Stenstrom Petroleum Services Group, S. Kinnie Smith, Jr., N.L. Stevens, III and James Stevens in his capacity as Chapter 7 Trustee were each held in default with respect to the Amended Adversary Complaint on September 12, 2014. (Order Granting Mot. for Default, ECF No. 49.)

2013 and in an unspecified manner[7], she was contacted by one "William R. Williams, III [who] ... inquired as to why this Office was not seeking recovery of the amount due for Illinois Estate Tax in the then-pending Vista bankruptcy." According to Mrs. Lowery, the caller "indicated that the assets of the Williams Estate were being liquidated in the Vista Bankruptcy." (Ill. Resp. ¶¶ 18-21, ECF No. 53, Ex. A.) The Affidavit further stated that Mrs. Lowery "declined to have further discussions with Mr. Williams on this matter, and directed other Assistant Attorneys General involved with this case to do the same." (*Id.* ¶ 22.)

On December 8, 2014, counsel for the State of Illinois took a deposition of William Williams, III. He testified that he was president of the Debtor for the prior 17 years, (Williams Dep. 8:1-6, ECF No. 66, Ex. B), and that Lois Williams was his mother. He further accounted that prior to her death in August 1999 she had owned approximately 50% of the shares of the Debtor and that her shares in the company were transferred to Mr. Williams and his siblings upon or after her death. However, contrary to the affidavit's account of the statement by Mr. Williams to Ms. Lowery in April 2013, Mr. Williams testified at the deposition that to his knowledge none of the assets of Lois Williams transferred to her children after her death were subsequently transferred to the Debtor. (Williams Dep. 28:1-20, ECF No. 66, Ex. B.) Incredibly, the State of Illinois attorney did not ask Mr. Williams any questions at the deposition about his supposed conversation with Ms. Lowery in August 2013, the conversation that is central to Ms. Lowery's October 20, 2014 affidavit.

In January 2015, the State of Illinois informed the court that in response to discovery requests, it had permission to go through the warehouse where Debtor's records were held. The court further ordered that the State have access to a specified storage unit between January 28 and 29, 2015 for the purpose of inspection and copying of the Debtor's corporate records. (Order Granting Mot. for Leave, ECF No. 64.)

The State subsequently amended its brief in opposition to BMO Harris' motion for summary judgment, and filed a "supplemental" response to BMO Harris' statement

---

[7] Paragraph 20 of the affidavit states that "[p]rior to this call, I had no knowledge of this bankruptcy," presumably implying that it was a telephone conversation. (*Id.* at ¶20.)

of facts.[8] (Ill. Suppl. Resp., ECF No. 67.)  BMO Harris filed its response to the State of Illinois' statement of additional facts on March 25, 2015, (BMO Resp., ECF No. 77),[9] to which the State of Illinois responded with a further Supplemental Memorandum of Law in Support of its amended response which it filed on June 2, 2015.[10] (Ill. Suppl. Mem., ECF No. 99.)

In the meantime, IDOR had filed its motion for summary judgment, together with supporting memorandum and statement of facts, seeking summary judgment in its favor on both its cross claim and on both counts of BMO Harris' amended complaint. (IDOR Mot. for Summ. J., ECF No. 69; IDOR Mem. of Law, ECF No. 71.)  BMO Harris filed its response to IDOR's statement of facts, (BMO Resp., ECF No. 81), as well as a combined reply in support of BMO Harris' motion for summary judgment and in response to IDOR's motion on March 25, 2015. (BMO Reply, ECF No. 79.)  To these submissions, IDOR also replied. (IDOR Reply Br., ECF No. 86.)

At a May 13, 2015 status hearing, counsel for the State of Illinois stated in open court that it did not contend that it had been deprived of the opportunity for discovery, but had found no other evidence of a transfer from the Williams estate to the Debtor other than an alleged statement of Ms. Williams' son.

When BMO Harris objected that the October 2014 affidavit of Ms. Lowery contained inadmissible hearsay, the State of Illinois filed with leave of court a supplemental memorandum and response, dated June 2, 2015, which included a so-called "Foundation Statement in Support of Lowery Affidavit Submitted by the Office of the Illinois Attorney General." (Ill. Suppl. Mem., ECF No. 99.)[11]  This "Foundation Statement" was prepared and electronically signed by counsel for the State of Illinois. It is not signed by Ms. Lowery, nor is it under oath.

---

[8] On that day, IDOR also filed a response to BMO Harris' motion, a memorandum in support and a response to BMO Harris' statement of facts which did not assert additional facts. (IDOR Resp., ECF No. 70; IDOR Mem. of Law, ECF No. 71.)

[9] The State of Illinois filed a supplemental memorandum in support of its response, (Ill. Suppl. Mem., ECF No. 84), which was later withdrawn. (Order Mooting Mot. to Strike, ECF No. 92.)

[10] BMO Harris filed a response to the State of Illinois' Supplemental Memorandum of Law on June 17, 2015. (BMO Reply, ECF No. 100.)

[11] As discussed below, the record is not entirely clear whether the exhibits to the document filed at ECF No. 99, including the Foundation Statement and attached e-mails were withdrawn by the State of Illinois. In any event, as discussed below, nothing in the exhibits changes the non-admissibility of the hearsay reference in Ms. Lowery's affidavit.

The Foundation Statement states that the alleged conversation between Ms. Lowery and Mr. Williams consisted of a telephone conversation that Mr. Williams supposedly initiated. This document claims that Mr. Williams called Ms. Lowery to discuss the possibility of settling the state's estate tax claims against him, and Ms. Lowery terminated the call as soon as Mr. Williams mentioned the Debtor's pending bankruptcy case, indicating to him that any further communications should be made through counsel. The Foundation Statement does not suggest how Ms. Lowery was able to identify the caller and admits that Ms. Lowery made no contemporaneous notes of the conversation. The document also acknowledges that there is no record of the date of the alleged conversation.

The unsworn Foundation Statement also attempts to supplement the affidavit to claim that counsel for the State of Illinois met with Mr. Williams on January 28, 2015 for the purpose of reviewing the Debtor's corporate documents. At that time, according to the document, Mr. Williams indicated that he had no recollection of making statements concerning assets of the Lois Williams Estate being liquidated in the Vista Marketing bankruptcy. The state also attached several alleged e-mails between Mr. Williams, his attorney, and Ms. Lowery dated May 13, 2013 to its statement. Why it chose to do so is puzzling. However, none of these e-mails reference any purported statements by Mr. Williams to the assets of the Lois Williams estate being liquidated in the Debtor's bankruptcy.[12] In one of the May 13 e-mails, Ms. Lowery tells Mr. Williams' attorney that the state has "learned that business assets of the estate have been liquidated in Mr. Williams' company bankruptcy," but makes no reference to how the state supposedly learned of that fact or what assets had been liquidated.

## JURISDICTION AND PROCEDURE

This proceeding seeks interpretation of this court's prior orders authorizing the sale of property of the estate, a determination of the validity, extent, or priority of liens on property of the estate and the allowance of claims against and liquidation of property of the estate. It constitutes a core proceeding. 28 U.S.C. § 157(b)(2)(A), (B), (K), (N), (O). To the extent the matter involves interpretation of this court's orders

---

[12] In several of the e-mails either Mr. Williams or his attorney references a conversation between Mr. Williams and Ms. Lowery in which Mr. Williams discussed the possibility of him filing a personal bankruptcy.

pursuant to Section 363 of the Bankruptcy Code, the matter "stems from the bankruptcy itself." *Stern v. Marshall*, 131 S. Ct. 2594, 2618 (2011). To the extent the matter involves a determination of the validity, extent and priority of liens on property of the estate and claims against such property, the matter "would necessarily be resolved in the claims allowance process." *Id.* In either case, it is a matter within this court's constitutional authority to enter final judgment. In open court before the court reached its decision, BMO Harris, the State of Illinois and the Illinois Department of Revenue confirmed and acknowledged their consent to this court's jurisdiction to rule upon the pending motions and enter summary judgment in this adversary proceeding.

## DISCUSSION

The parties do not dispute BMO Harris' assertion that, to the extent the funds in escrow constitute proceeds of the Riverside Property or fuel inventory at the Meridian Property, BMO Harris has a perfected lien on such proceeds on account of its mortgages, security agreement and UCC financing statement. The parties also do not dispute that BMO Harris is entitled to the $10,738.97 portion of the sale proceeds attributable to fuel inventory from the Meridian Property, and is entitled to the other proceeds it has already received pursuant to the sale order. (*See, e.g.,* IDOR Mem. of Law 4, ECF No. 71 ("what IDOR seeks by way of its cross-motion is a determination that it has a right to turn-over of the balance in the amount of $303,211.49.").) The State of Illinois argues rather that summary judgment is not appropriate because there is a material dispute as to whether the state can assert a statutory lien with higher priority than BMO Harris' lien. IDOR argues that there is no dispute of fact, but as a matter of law it is entitled to the proceeds either as adequate protection for its terminated state law right to obtain payment from the purchaser Kelley Williamson or because the funds in escrow are not really proceeds of sale but rather constitute money that Kelley Williamson paid to satisfy Kelley Williamson's obligations to the State of Illinois.

The State of Illinois Claim

For purposes of the motion for summary judgment, the parties agree that Lois Williams died on August 5, 1999. (BMO Resp. ¶ 60, ECF No. 77.) An Illinois estate tax return was filed for Ms. Williams, and the Illinois Attorney General's Office assessed a tax liability of Ms. Williams' estate in the amount of $209,917.00. (*Id.* at ¶¶ 61-62.) Pursuant to 35 ILCS 405/6(b), Ms. Williams' estate was permitted to defer payment of $86,306.00 and to pay that amount by installments. (*Id.* at ¶ 63.) The Williams estate made certain payments between May 18, 2001 and May 19, 2010. (*Id.* at ¶¶ 64-65.) After the estate failed to make a scheduled payment in 2011, the state accelerated the remaining tax due, of which together with statutory interest and penalties, amounted to $61,748.88 as of May 1, 2013. (*Id.* at ¶¶ 66-68.)

The State of Illinois alleges that in April 2013 the state learned "that assets of the Lois Williams Estate had been transferred to Debtor Vista Marketing." (*Id.* at ¶ 69.) Based on this allegation, which BMO Harris disputes, the state argues that it had a lien on the Riverside Property and, now, in the sale proceeds thereof that is senior to BMO Harris' interest.   BMO Harris argues that the state has failed to present admissible evidence to show any connection between the Williams estate and the Riverside Property, and that even if the state had a lien in the Riverside Property, the state did not record its lien and, therefore, its interest is junior to BMO Harris' lien.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), incorporated by reference by Fed. R. Bankr. P. 7056.  For purposes of a motion for summary judgment, the court "must construe all facts and draw all reasonable inferences in favor of the non-movant." *Srail v. Village of Lisle*, 588 F.3d 940, 949 (7th Cir. 2009).  However, the court "need not draw inferences that are supported by 'only speculation and conjecture'" and a factual dispute is genuine only "if a reasonable jury could find for either party." *Woods v. City of Berwyn*, 803 F.3d 865, 869 (7th Cir. 2015) (quoting *Nichols v. Mich. City Plant Planning Dept.*, 755 F.3d 594, 599 (7th Cir. 2014)).  If a party moving for summary judgment has properly supported his motion, the burden shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial. *Chaib v. Indiana*, 744 F.3d 974, 981 (7th

Cir. 2014). The Seventh Circuit has often called summary judgment the "put up or shut up" moment in litigation, "by which we mean that the non-moving party is required to marshal and present the court with the evidence she contends will prove her case. And by evidence, we mean evidence on which a reasonable jury could rely." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

The "nonmoving party need not meet … the preponderance of the evidence standard, but must still provide more than a 'mere scintilla' of evidence to show that there is a genuine issue of material fact." *Id.* In particular, a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). An "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A party "may not rely on inadmissible hearsay to avoid summary judgment." *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 657 (7th Cir. 2011). Thus, "affidavits, consisting of nonspecific and hearsay testimony, are insufficient to preclude summary judgment." *House of Brides, Inc. v. Alfred Angelo, Inc.*, 2016 WL 698093, at *8 (N.D. Ill. Feb. 19, 2016) (citing *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003); *Ward v. First Fed. Sav. Bank*, 173 F.3d 611, 618 (7th Cir. 1999)).

The State of Illinois had over fifteen months from when it first appeared before this court in response to the original motion for turnover until it filed its original response to BMO Harris' motion for summary judgment. After it filed that response, the state requested and received additional opportunity for discovery and during this time took the deposition of William Williams, III. This court granted the state's request to examine the files of the Debtor, and ordered that the state take possession of the records of the Debtor from Debtor's counsel. (Order Granting Mot. for Leave, ECF No.

95.) The state admits that it was able to inspect these documents. Indeed, at a status hearing held on May 15, 2015—over fifteen months after the complaint was filed, and more than two years after the original motion for turnover was filed—the state's attorney confirmed that her client did not contend that it had been deprived of the opportunity to take its discovery. Further, over the months following its initial response to BMO Harris' motion, the court permitted the state to file amended and supplemental responses and briefs to the motion. (Ill. Am. Resp., ECF Nos. 66; Ill. Suppl. Resp., ECF No. 67; Mot. for Leave, ECF No. 102.) The state has clearly been afforded more than ample opportunity to prepare its case. Yet the only evidence it presents in support of its claim and opposition to summary judgment regarding tis alleged lien on the Riverside Property is the deposition transcript of the Debtor's former president and majority shareholder, William R. Williams, III, and the affidavit of the bureau chief of the Attorney General's Revenue Litigation Office. But the transcript of the December 8, 2014 deposition turns out to contradict rather than support the state's allegation. According to the transcript, Mr. Williams testified under oath that to his knowledge no assets of the estate of Lois Williams were ever transferred to the Debtor. He further testified that none of the assets transferred to her children were ever subsequently transferred to the Debtor. (Williams Dep. 28:1-20, ECF No. 66, Ex. B.) Tellingly, the transcript reveals the state never questioned Mr. Williams about his supposed telephone conversation with Ms. Williams in April 2013, or otherwise asked him about the allegations asserted in the Lowery affidavit prepared many weeks before the deposition.

In that affidavit, Ms. Lowery stated that on an unspecified date in April 2013 in an unspecified manner she somehow was contacted by William R. Williams, III, who "inquired as to why this Office was not seeking recovery of the amount due for Illinois Estate Tax in the then-pending Vista bankruptcy." According to this account, Williams "indicated that the assets of the Williams Estate were being liquidated in the Vista Bankruptcy." (Lowery Aff. ¶¶ 18-21, ECF No. 66, Ex. A.) Ms. Lowery further stated that she "declined to have further discussions with Mr. Williams on this matter, and directed other Assistant Attorneys General involved with this case to do the same." (*Id.* ¶ 22.)

The state offers Ms. Lowery's affidavit as its only evidence in support of its claim and to contradict the deposition testimony of Mr. Williams. BMO Harris objects on the grounds that the affidavit is inadmissible hearsay which may not be interposed to avoid summary judgment. *See House of Brides*, 2016 WL 698093. The state concedes that none of the specifically stated exceptions to the hearsay rule applies, relying instead on the residual exception set out in Fed. R. Evid. 807 to argue for its admissibility.

Hearsay is presumptively inadmissible and the burden is on its proponent to overcome that presumption. *Messer v. Indiana State Police*, 586 F. Supp. 2d 1044, 1057 (N.D. Ind. 2008). For the residual exception to apply, the state must demonstrate: "(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice." Fed. R. Evid. 807(a).[13] The Seventh Circuit has long held that the residual exception must be narrowly construed. *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 631 (7th Cir. 2006); *United States v. Sinclair*, 74 F.3d 753, 759 (7th Cir. 1996). Reliability being "the core of the hearsay rule", it follows then that "the central question [for application of the residual exception] is whether the circumstances and content of an out-of-court statement give the court confidence that the statement is sufficiently reliable to admit as evidence despite the inability to test it directly in court." *Kubsch v. Neal*, 800 F.3d 783, 798 (7th Cir. 2015). The showing of the requisite "circumstantial guarantees of trustworthiness ... are those that existed at the time the statement was made and do not include those that may be added by using hindsight." *Huff v. White Motor Corp.*, 609 F.2d 286, 292 (7th Cir. 1979).

Courts have identified a number of recurring factors evidencing "circumstantial guarantees of trustworthiness, including: the spontaneity of the hearsay statement and lapse of time between the event and the statement, the declarant's motivation and spontaneity, whether the statement was recorded or reaffirmed, and whether the

---

[13] It is apparent, however, that hearsay statement at issue "is offered as evidence of a material fact" as required by Fed. R. Evid. 807(a)(2). Similarly, the final requirement for admissibility, namely that the adverse party must have reasonable notice of the intent to offer the statement and its particulars so that it have a "fair opportunity to meet it," is not at issue here. Fed. R. Evid. 807(b).

declarant's firsthand knowledge is clearly demonstrated. 2 KENNETH S. BROUN, *et al.,* MCCORMICK ON EVID. § 324, at 563-565 (7th ed. 2013). Here, the state presents little to demonstrate the trustworthiness of the hearsay statements found in its affidavit. Ms. Lowery's affidavit setting out her purported communication with Mr. Williams is hardly spontaneous having been prepared after a lapse of well over a year from the alleged telephone conversation with Williams. Ms. Lowery, one of the Attorney General's bureau chiefs, is not shown to be a person without interest in the outcome of this proceeding or someone whom Mr. Williams would take into confidence and speak as a confident. *Compare, e.g., U.S. v. Vretta,* 790 F.2d 651, 659 (7th Cir. 1986) (no reason to lie to a close friend). Ms. Lowery gives no details as to when or how the purported communication with Mr. Williams took place other than the general statement that it occurred some time during April 2013. She does not state in the affidavit whether she knew or had any dealings with Mr. Williams before the purported communication or how she knew that it was in fact he who was contacting her, and the court is left to assume that he was a stranger to her at the time of the call. Ms. Lowery states that she had no further discussions on the matter with Mr. Williams after the call. The state does not claim that any contemporaneous record of the call exists nor does it demonstrate or even suggest how its proponent is able to reliably recall the statements months before she signed her affidavit. No recording, or contemporaneous record or any notes of this conversation exists according to the state, and the state does not suggest how she was able to recall its details long after her one conversation with Mr. Williams.

In addition, Rule 807(a)(3) requires that the party offering the hearsay account demonstrate that it is "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." *Huff,* 609 F.2d at 291. The state has not explained why it was unable to obtain more probative evidence through reasonable efforts than the unsupported hearsay statement by a not disinterested witness. As discussed above, the state was provided more than adequate time for discovery, and indeed, was granted every opportunity to take discovery it requested. The Debtor's physical records were turned over to it. The state took the deposition under oath of the alleged hearsay declarant, Mr. Williams, yet asked him no

questions about the purported conversation with Ms. Lowery even after he flatly denied under oath any knowledge that assets transferred to the children of Lois Williams after her death were subsequently transferred to the debtor. Apparently satisfied with its ability to take such discovery it believed necessary for this case, the state does not explain why it was unable to obtain better evidence, such as financial documents evidencing the alleged transfer of assets from the deceased's estate.

According to Ms. Lowery's affidavit, Mr. Williams told her while not under oath that assets of the Lois Williams estate were being liquidated in the Debtor's bankruptcy case at a time that he was a defendant in a suit by the Lois Williams estate. The state suggests that Mr. Williams "can be presumed to have wished to induce the state to file its claim in this bankruptcy rather than pursue him personally." (Ill. Am. Suppl. Mem. of Law 6, ECF No. 102.) The state appears to argue however, that Mr. Williams should be presumed to have spoken the truth out of fear of potential civil liability for fraud because at the time the State of Illinois was apparently seeking recovery of taxes from him. But in doing so the state does not explain Mr. Williams' subsequent denial of these allegation while under oath, presumably an even greater cause for caution, if not fear, during his December 2014 deposition.

The transcript of the December 2014 deposition of William Williams reveals that while the state's attorney questioned him about Lois Williams' estate and about the Debtor, he incredibly failed to ask any questions about Mr. Williams' alleged communication with Ms. Lowery in April 2013. Indeed, it appears that the deposition transcript offered by the state contradicts the key points of Ms. Lowery's written account. Thus, the court cannot conclude that Ms. Lowery's hearsay account is "more probative on the point for which [it] is offered than any other evidence [the proponent] can obtain through reasonable efforts." *Rosenbaum v. Freight, Lime & Sand Hauling, Inc.*, 2013 U.S. Dist. LEXIS 28289, at *9 (N.D. Ind. 2013).

Finally, the state fails to demonstrate that the admission of this hearsay "will best serve the purposes of these rules and the interests of justice." Fed. R. Evid. 807(a)(4); *Keri*, 458 F.3d at 631. A court is not required to remedy the proponent's simple failure to take discovery or deficient preparations for the adjudication of this claim when it had adequate opportunity to do so. *See Abernathy v. Superior*

*Hardwoods, Inc.*, 704 F.2d 963, 970 (7th Cir. 1983) (affirming trial court's refusal to admit the hearsay testimony of party's private investigator when the party could have subpoenaed the records in question and depose the record custodian).

The unsworn self-styled "Foundation Statement" offered by the state in support of admissibility, essentially another unsupported hearsay account, appears if anything to work at cross-purposes to the state's. The vague representations and more importantly, omissions, contained in this submission undermine the argument that the hearsay is trustworthy, more probative and serves the interests of justice. In the Foundation Statement the state admits that no notes of the alleged call were taken and that it is unable to determine even the actual date of the alleged conversation. The Foundation Statement then acknowledges that Mr. Williams has denied making those statements. The hearsay statement contained in email correspondence attached to the Foundation Statement appear to have little relevance to the admissibility issue, as they purportedly relate to a potential settlement of IDOR's personal claims against Mr. Williams. Thus, the circumstances alleged in the Foundation Statement about the affidavit do not enable this court to conclude that the hearsay account of the phone call is trustworthy within the narrow terms of the residual exception. *Sinclair*, 74 F.3d at 759.

The state has failed to demonstrate that its admittedly hearsay evidence offered in opposition to the BMO Harris motion meets the requirements of Fed. R. Evid. 807. Therefore, the purported statements attributable to Mr. Williams contained in Ms. Lowery's affidavit are inadmissible. As such they cannot be used to preclude summary judgment. *See House of Brides*, 2016 WL 698093. The State of Illinois also fails to present admissible evidence that even supports its assertion that any assets liquidated in the Debtor's bankruptcy case were in fact assets of the Williams Estate or traceable proceeds of assets of the Williams Estate or that, based on any interest it may have regarding the Williams probate estate, it holds a lien on the proceeds of the Riverside Property, the Meridian Property or any other assets sold in the January 2014 sale approved by this court. Further, the State of Illinois does not dispute BMO Harris' lien in the proceeds. Thus, because the state fails to demonstrate that it has a valid lien interest in the proceeds or that a genuine issue of material fact otherwise exists

regarding BMO Harris' lien in the proceeds, summary judgment must be entered in favor of BMO Harris and against the State of Illinois.

The IDOR Claim

IDOR concedes that it has no right to the $10,738.97 portion of the sale proceeds attributable to fuel inventory. (*See* IDOR Mem. of Law, ECF No. 71.) The department also concedes that BMO Harris "held valid liens against the Meridian and Riverside Properties." Moreover, IDOR has not alleged that it held any lien interest in the Riverside Property that would be superior to BMO Harris' mortgage interest. To the contrary, IDOR states that it does not "argue that it has priority over BMO Harris based on any tax liens that IDOR recorded" and "is not asserting a claim to the proceeds based on liens recorded against the Debtor." (*Id.*) Instead, it argues either that it was granted a right in the proceeds by this court's sale order as "adequate protection" for its extinguished right to collect from the purchaser or that all or a portion of the escrowed funds are not proceeds from the sale of the real estate.

BMO Harris does not dispute, at least for purposes of this motion, that as of the petition date the Debtor owed $707,109.60 in Retailers' Occupation Taxes and related pre-petition penalties and interest and that the IDOR also filed a claim for Motor Fuel Tax liability in the amount of $989,635.31. (BMO Resp., ECF No. 81.) Both IDOR claims, (Claim Nos. 13-1, 14-1), were filed after the sale was completed.

Under state law, the Illinois Department of Revenue can instruct a purchaser of the major part of the stock of goods, furniture or fixtures, machinery and equipment or the real property of a business subject to the Illinois Retailers' Occupation Tax Act to withhold a portion of the purchase price to cover the seller's outstanding tax liabilities. If the purchaser does not remit the appropriate amount of withheld money to IDOR upon demand, the purchaser becomes liable to the department for the seller's outstanding tax liabilities up to the reasonable value of property acquired. 35 ILCS 120/5j[14]; *Ill. Dep't of Revenue v. Elk Grove Vill. Petroleum, LLC*, 2015 WL 8481961, at *2 (N.D. Ill. Dec. 9, 2015).

---

[14] 35 ILCS 505/21 makes various provisions of the Retailers' Occupation Tax Act, including 35 ILCS 120/5, 5a and 5j, applicable to motor fuel taxes. 35 ILCS 105/12 does the same with respect to use taxes. For simplicity, this Opinion will make references only to Retailers' Occupation Taxes and the provisions of 35 ILCS 120/1 *et seq.*, although the IDOR also asserts a claim for motor fuel taxes and use taxes.

In this case, however, IDOR failed to appear or object to the Debtor's motions to approve the sale of the Riverside and Meridian Properties, despite receiving notice of the motions, and the court entered an order approving the sales "free and clear of all liens with all liens to attach to the proceeds pursuant to 11 U.S.C. § 363." (Order Granting Mot. to Sell, ECF No. 69.)  IDOR initially attempted to enforce the Debtor's tax liability against the purchaser, Kelley Williamson, but this court found that "any potential liability of Kelley Williamson under 35 ILCS 120/5j and 35 ILCS 5/902 is an 'interest' subject to Section 363(f)" and, that "IDOR's 'interest' was extinguished pursuant to Section 363(f) of the Bankruptcy Code, as part of the sale of the Debtors' property during the underlying bankruptcy case." *In re Vista Marketing Group Ltd.*, 2014 WL 1330112 (Bankr. N.D. Ill. Mar. 28, 2014).[15]   Kelley Williamson took the property free and clear of any such interest. *Id.*

### *Adequate Protection under the Order*

IDOR argues that, despite its failure to timely assert its interest under the Illinois tax statutes, this court *did* grant it adequate protection in the sale order. To support this, the department points to language in the order stating that "[a]ll remaining proceeds from the sale of the Riverside Property, with all liens, claims, encumbrances and other interest into and against those remaining proceeds to attach thereto are to be held subject to further order of the Bankruptcy Court." (Order Granting Mot. to Sell, ECF No. 69.)  IDOR argues that its interest or right to be paid attached to the proceeds of the sale. But even if that is true, BMO Harris' mortgage lien in the property also attached to the proceeds. BMO Harris' argument is not that IDOR had no lien or other interest in the proceeds. Rather, the creditor claims that its mortgage interest in the proceeds is prior and superior to the interest of any other

---

[15] In the IDOR's Answer to the Amended Complaint, IDOR makes reference to 35 ILCS 5/902 in addition to 35 ILCS 120/5j. (IDOR Answer to Am. Compl. ¶ 58, ECF No. 36.) Section 5/902(d) creates a liability of certain bulk sale purchasers for the *income tax* liabilities of a seller in a similar manner to the creation of liability under 35 ILCS 120/5j for unpaid Retail Occupation Taxes. However, in its submission for the cross motions for summary judgment, IDOR has made no further reference to 35 ILCS 5/902, and in fact criticizes BMO Harris for "erroneously cit[ing] to the analogous lien provisions of the Illinois Income Tax Act" instead of the lien provisions under the Retailers' Occupation Tax Act at 35 ILCS 120/5a. (IDOR Mem. of Law, ECF No. 71.) The court will treat any argument under 35 ILCS 5/902 as abandoned, and in any event, there is nothing in 35 ILCS 5/902 to suggest that the transferee liability interest under that section is superior in nature to the transferee liability interest under 35 ILCS 120/5j.

party. Were there any ambiguity in the sale order itself, the sale motion makes clear that any liens, claims, encumbrances or other interests into and against the Riverside Property attached to the proceeds of sale in the *same priority* as they were against the Riverside Property prior to the sale. (*See* Mot. to Sell Riverside Prop. ¶ 7, ECF No. 44 ("with any such liens or encumbrances to attach to the proceeds of sale in the same order of priority that such liens and encumbrances possessed against the Real Property").)

IDOR does not allege let alone demonstrate that it had a lien or other interest in the Riverside Property senior to BMO Harris' mortgage interest, and for that reason has failed to prove that it has a senior interest in the proceeds. The Illinois Retailers' Occupation Tax Act provides that IDOR "shall have a lien for the tax herein imposed or any portion thereof ... upon all the real and personal property of any person to whom a final assessment or revised final assessment has been issued." 35 ILCS 120/5a. However, the same provision makes clear that "[n]othing in this Section shall be construed to give the department a preference over the rights of any bona fide purchaser, holder of a security interest, mechanics lienholder, mortgagee, or judgment lien creditor arising prior to the filing of a regular notice of lien or a notice of jeopardy assessment lien in the office of the recorder in the county in which the property subject to the lien is located." *Id.* IDOR does not allege that it ever filed a notice of lien, much less filed one prior to the second mortgage on the Riverside Property that BMO Harris recorded on May 9, 2008.

Admitting that it is not asserting a lien, IDOR argues that under 35 ILCS 120/5j, the Debtor would have been unable to sell the Riverside Property outside of bankruptcy without IDOR having a right collect its tax debt from either the proceeds of the sale or from the purchaser. From this the department appears to argue that since it was unable to collect the tax debt from Kelley Williamson it should be able to collect the tax debt from the sale proceeds. But, the issue in this Adversary Proceeding is not IDOR's rights against the purchaser[16] or against the Debtor, but rather its rights in the

---

[16] The IDOR's rights against the purchaser, Kelley Williamson, were already addressed in this bankruptcy case in the court's memorandum opinion and order granting Kelley Williamson's motion for rule to show cause against the department. *In re Vista Marketing Group Ltd.*, 2014 WL 1330112 (Bankr. N.D. Ill. Mar. 28, 2014).

proceeds of sale as against BMO Harris. As an initial matter, the statutory provision IDOR relies on refers to a sale or transfer by a taxpayer. 35 ILCS 120/5j ("If any taxpayer, outside the usual course of his business, sells or transfers."). It is not clear that the statute would apply to a sale by a bankruptcy trustee (including a Chapter 11 debtor in possession) or to a judicial sale, such as in a foreclosure proceeding. The department has not cited, and the court is not aware of any Illinois decision in which a court imposed liability under Section 120/5j upon a purchaser at a judicial sale.[17]

To the contrary, in one of its responses to BMO Harris' original motion for turnover, IDOR appears to concede that Section 120/5j would not apply to a judicial sale in connection with a foreclosure proceeding. The department states in its submissions that if a secured creditor finds a debtor's proposed sale to a third party unacceptable, "it is free [to] reject the proposed bulk sale by refusing to release liens and instead foreclose and either take back its collateral or have it sold at a sheriff's sale in which case transferee liability under § 5j does not apply." (IDOR Obj. to Mot. for Turnover ¶ 18, ECF No. 100.) IDOR suggests that the "result which applies outside of bankruptcy should also apply to sales made in bankruptcy." (*Id.*) By this, IDOR presumably means that a Section 363 sale in bankruptcy should be treated like a non-judicial sale outside of bankruptcy, not treated like a judicial sale outside of bankruptcy. But there is a fundamental similarity between a judicial sale in foreclosure and a Section 363(f) sale with respect to secured creditors. While a normal non-bankruptcy sale by a taxpayer will not ordinarily terminate the security interest of a creditor in the property thus transferred, both a judicial sale and a Section 363(f) sale may. Thus, 35 ILCS 120/5j may be silent with respect to the rights of secured creditors because in ordinary non-judicial sales the secured creditor can still pursue its rights against the transferred property, even in the hands of the purchaser. IDOR asks for an interpretation of 35 ILCS 120/5j that potentially deprives secured creditors of any remedy in Section 363(f) sales. Not surprisingly, the department does not present authority for a suggested

---

[17] A confirmed sale pursuant to a judgment of foreclosure terminates the interest in the mortgaged real estate of all nonrecord claimants given proper notice, including the State of Illinois or any political subdivision thereof with an interest or claim for lien. *See* 735 ILCS 15-1404; 735 ILCS 15-1501(b)(6). The proceeds of such judicial sale are to be applied, after expenses of sale and presale maintenance, to "satisfaction of claims in the order of priority adjudicated in the judgment of foreclosure or order confirming the sale." 735 ILCS 5/15-1512.

interpretation so plainly incongruous with a statute that protects the rights of secured creditors as against tax liens, expressly stating that tax liens are junior to the rights of a mortgage arising prior to the filing of a notice of tax lien. 35 ILCS 120/5a. Indeed, the interpretation suggested appears to be incompatible with a foreclosure regime that permits a mortgage holder to terminate the rights of the department under 35 ILCS 120/5j through a judicial sale in foreclosure.

However, even were 35 ILCS 120/5j to apply to Section 363(f) sales, IDOR does not dispute that Section 363(f) can terminate the right or "interest" that the department would otherwise have under state law to collect the seller's tax obligation from the purchaser in a sale authorized under Section 363(f). Instead, IDOR argues that it has the right to adequate protection of such interest. But to the extent that IDOR seeks such adequate protection against the sale proceeds, the department's argument ignores the fact that BMO Harris was also entitled to adequate protection before its mortgage interest was terminated. It is uncontroverted that both claimants had notice of and the opportunity to appear at the hearing on the motions to authorize the sale of the properties.[18] Unlike IDOR, BMO Harris appeared, objected and asserted its right to adequate protection before the sale motions were granted. All the while, the department did not act. Moreover, BMO Harris had a lien right in the Riverside Property which would have been superior to IDOR's right in a foreclosure proceeding. Outside of bankruptcy BMO Harris could have forced the termination of the department's right in the Riverside Property through a foreclosure, while IDOR could not have done the reverse.

The department correctly notes that two recent decisions by the district court have found that IDOR's right to seek recovery from a bulk sale purchaser under 35 ILCS 120/5j has value that may be subject to adequate protection before such right is extinguished by a Section 363(f) sale. *In re Elk Grove Vill. Petroleum*, 510 B.R. 594, (Bankr. N.D. Ill. 2014); *In re Naperville Theater, LLC*, 2016 WL 930659 (N.D. Ill.,

---

[18] As this court found in its earlier decision regarding the department's actions following the Section 363(f) sale of the properties, a decision which the IDOR did not appeal: "[t]he Department does not dispute that it received notice of the two motions to approve the proposed sales of the Debtor's properties. It did not file an objection to either motion nor appear at the hearings on the motions. The department has not sought to vacate or amend or otherwise contest the January 3, 2013 Sale Order authorizing the sale of the Properties 'free and clear.'" (Mem. Op. 8, ECF No. 194.)

March 10, 2016). However, neither of those cases held that the department has a right to recovery to the prejudice of a holder of a senior interest in the collateral. In the *Elk Grove* and *Naperville Theater* cases the department asserted a right to adequate protection under Section 363(e) and objected to the proposed sale *prior* to the bankruptcy court's approval of the sale of assets. *In re Elk Grove*, 510 B.R. at 598; *In re Naperville Theater*, 2016 WL 930659. In marked contrast, in the instant case the department did nothing until well after the court entered the sale order and the sales closed despite receiving notice of the Section 363(f) motion. (Mem. Op. 3, 8, ECF No. 194.)

The Bankruptcy Code provides for adequate protection of certain interests in property, but such protection must generally be requested. For example, the holder of an interest that will be extinguished by a Section 363(f) sale has "the right to seek protection under section 363(e), and *upon request*, the bankruptcy court is obligated to ensure that their interests are adequately protected." *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 548 (7th Cir. 2003) (emphasis added). Section 363(e) provides that "*on request of an entity that has an interest in property* used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e) (emphasis added). If a secured creditor or interest-holder fails to object or request adequate protection, they risk waiving their right to such protection. *See, e.g., In re Greives*, 81 B.R. 912, 965 (Bankr. N.D. Ind. 1987) ("The secured creditor should not be allowed to file an adequate protection motion and obtain an order that would require substantial adequate protection payments retroactively"); *In re T.A. Brinkoetter & Sons, Inc.*, 2012 WL 1865485 (Bankr. C.D. Ill. May 22, 2012) ("The concept of waiver is implicit in those cases that hold that a secured creditor's right to begin receiving adequate protection does not arise until the creditor files a motion requesting such relief.") (citing *In re Blackwood Assocs., L.P.*, 153 F.3d 61, 68 (2nd Cir. 1998); *In re Brian Wise Trucking, Inc.*, 386 B.R. 215 (Bankr. N.D. Ind. 2008)). As noted by the bankruptcy court in *In re Robinson*, "a creditor is entitled to adequate protection only from the time the same is requested. 'Colloquially expressed, if you don't ask for it, you won't get it.'" 225 B.R.

228, 233 (Bankr. N.D. Okla. 1998) (citing *In re Kain*, 86 B.R. 506, 512 (Bankr. W.D. Mich. 1988); *In re Continental Airlines, Inc.*, 134 B.R. 536, 544 (Bankr. D. Del. 1991); *In re Cason*, 190 B.R. 917, 928 (Bankr. N.D. Ala. 1995)). While the trustee or debtor-in-possession "has the burden of proof on the issue of adequate protection," 11 U.S.C. § 363(p)(1), the "entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest." 11 U.S.C. § 363(p)(1). The "onus [is] on the creditor, rather than on the debtor, to seek judicial relief if it believes that its interests are not adequately protected." *Thompson v. General Motors Acceptance Corp.*, 566 F.3d 699, 707 (7th Cir. 2009). Here, there is no dispute that the department had sufficient notice of the motions to approve sale, but failed to object to the motions before they were granted or to timely appeal or seek reconsideration of the orders.

IDOR refers the court *People's Capital & Leasing Corp. v. Big3D, Inc. (In re Big3D, Inc.)* as support for its assertion that it is entitled to receive retroactively adequate protection. 438 B.R. 214 (9th Cir. B.A.P. 2010). There the Ninth Circuit Bankruptcy Appellate Panel, sitting *en banc*, affirmed the bankruptcy court's refusal to grant retroactive adequate protection. *Id.* However, numerous features of this decision make it less than persuasive as guidance for this case.[19] First, although the decision to affirm the bankruptcy court was unanimous, it was without a majority opinion. More importantly, all of the judges on the panel recognized that the majority and current trend was for a bright-line rule *against* retroactive adequate protection, but differed on whether the panel should overrule an earlier holding of the panel. Two judges in the *Big3D* panel favored the "bright-line rule … that adequate protection payments are available to a secured creditor only from and after the date of filing of its motion." *Id.* at 233-34 (Pappas, C.J.) (citing 3 *Collier on Bankruptcy* ¶ 361.02[3], 361-7 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed., 2010); *TranSouth Fin. Corp. v. Sharon (In re Sharon)*, 234 B.R. 676, 684 (6th Cir. B.A.P. 1999)). Another judge in the panel, while

_____

[19] A Bankruptcy Appellate Panel from another circuit is, of course, not binding on this court—indeed, it is not even clear that a Bankruptcy Appellate Panel decision is binding on bankruptcy courts within the circuit. *See Zimmer v. PSB Lending Corp. (In re Zimmer)*, 313 F.3d 1220, 1225 n. 3 (9th Cir. 2002) (calling the binding nature of Bankruptcy Appellate Panel decisions "an open question in this circuit"). The matter was apparently heard by a six-judge panel, but the reported opinion accounts for only five of the six judges.

recognizing that a "significant majority of later decisions follow" the bright-line rule, concluded that held that the general principles in that circuit regarding the discretion of the bankruptcy court to fix adequate protection payments "remain viable." *Id.* at 227 (Dunn, J.). Two judges, noting that the result under the facts of the case would be the same regardless of which rule they applied, dissented from the decision to hear the matter *en banc. Id.* at 235 (Markell, J.). Thus, the *Big3D* decision offers little support for the department's position. Indeed, even if this court has discretion to grant adequate protection retroactively, IDOR has offered no explanation for its failure to timely object or assert its interest prior to the sale orders being entered. Without such explanation, IDOR fails to demonstrate why at this point it should be entitled to adequate protection from the proceeds.

Moreover, even if the department did have a right to adequate protection, it does not demonstrate that it has such a right to the prejudice of BMO Harris' interest in the Riverside Property or proceeds thereof. Section 361(2) provides that adequate protection may be provided by providing an additional or replacement lien in other property. The provision does not specifically authorize the grant of a lien in property in which another entity has an interest. But even if a grant of such a lien is permitted, the interest of the other creditor must be adequately protected. 11 U.S.C. § 363(e). This is most clearly seen in Section 364(d)(1), which allows for the grant of a priming lien to secure post-petition credit only if "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). In other words, even if IDOR had a right to adequate protection, it did not have a right to BMO Harris' collateral. Nothing in the sale order suggests that IDOR was granted any interest in the proceeds of sale ahead of BMO Harris. To the contrary, as discussed above, the order indicates that BMO Harris' senior interest in the Riverside Property was to be transferred to a similarly senior interest in the proceeds of sale.

Finally, IDOR argues that the funds in escrow are not really proceeds of the Riverside Property. Instead, it asserts that they constitute funds that Kelley Williamson paid to terminate the obligation it would have otherwise had to pay the Debtor's use and occupation taxes under 35 ILCS 120/5j. The argument is a minor

variation of those discussed and rejected above.  IDOR contends that outside of bankruptcy, Kelley Williamson would not have been able to purchase the Riverside Property without also paying or being obligated for the Debtor's tax liabilities.  IDOR therefore concludes that "the consideration paid by KWC … was tendered to satisfy the department's transferee liability claim." (IDOR Reply Br., ECF No. 86.)  But there is nothing in the sale order to support this argument.  The full amount paid by Kelley Williamson is described as "the purchase price of" the two real estate properties. (Order Granting Mot. to Sell, ECF No. 69.)  It makes little sense why the sale order would have permitted the full payment of BMO Harris on its first mortgage, full payment to BMO Harris of the net proceeds of the Meridian Property and full payment to the Rockford Local Development Corporation.  Why would the rights securing those interests be superior to IDOR's right but not BMO Harris' third mortgage rights in the Riverside Property?  It is undisputed that the tax obligation to IDOR greatly exceeded the escrowed proceeds, so it is not as though the proceeds were a carve-out to pay IDOR in full.

To the contrary, the history of the motion and order tends to support the meaning of the sale order exactly opposite to the department's proposed interpretation. The original motion to approve the sale actually made reference to occupation taxes, stating that approval of the sale "would pay off all liens on said property and, by virtue of paying off liens filed on behalf of the Illinois Department of Revenue for unpaid retailer's occupation taxes, would also serve to remove such liens from other real estate owned by the Debtor." (Mot. to Sell Riverside Prop. ¶ 6, ECF No. 44.)  The original proposed order attached to the motion provided for payment not only of real estate taxes but also payment of "any other taxes related to the sale of the property." (*Id.*) However, BMO Harris objected to the motion as originally proposed, and specifically objected to any payment to IDOR. (BMO Obj., ECF No. 54.)  BMO Harris objected that IDOR had not recorded any notices of liens on the Riverside Property and that the sale proceeds were not enough to even pay off BMO Harris' full mortgage indebtedness. (*Id.*) Thus BMO Harris contended that the order should provide for payment to: "1) BMO Harris Bank all amounts due under Note 4; 2) all amounts due and owing to the U.S. Small Business Administration and the Rockford Local Development Corporation; and

3) all remaining proceeds to BMO Harris Bank under Notes 1, 2, and 3." (*Id.*)

Eventually, the parties contesting the motion to authorize the sale agreed on a form of the order to propose to this court which provided for payment first to BMO Harris on its first mortgage, second to the United States S.B.A. / Rockford Local Development Corporation on its second mortgage, and the remaining proceeds to be held subject to court order with all liens, claims, encumbrances and other interests to attach to the remaining proceeds. After further hearing on the matter the court accepted and entered that proposed order. (Order Granting Mot. to Sell, ECF No. 69). While it is true that the final order did not expressly determine who was entitled to the escrowed proceeds, there is no evidence that the compromise was intended specifically to preserve IDOR's rights. As discussed above and in this court's earlier decision on the effect of the sale of the properties under Section 363(f), IDOR had not objected to the motion or participated in the bankruptcy case by the time the order was entered. Nor does the department now allege—and the record does not suggest—that IDOR participated in any negotiation over the motion to sell or the form of the proposed order.[20] Thus, rather than support the department's argument that the order was intended to provide for payment of its tax claim, the record of the motion to approve the sale indicates that provision for payment of IDOR's claim was specifically rejected.

Because the sale order preserved the pre-sale priority of interests in the proceeds of the Riverside Property, and because there is no dispute of genuine fact that BMO Harris' interest in both the Riverside Property and the proceeds thereof are superior to the rights and interests of IDOR, summary judgment must be entered in favor of BMO Harris and against the department.

---

[20] To the contrary, the court's notes reflect that at the hearing on the motion to sell on December 19, 2012, counsel for creditors N.L. Stevens and Kinnie S. Smith appeared and expressed concern about the form of the proposed order. (*See also*, Appearances, Case No. 12-B-83168, Dec. 19, 2012, ECF Nos. 56, 57.)

## CONCLUSION

For the foregoing reasons, BMO Harris' motion for summary judgment is granted and IDOR's cross-motion for summary judgment is denied. Summary judgment shall be entered in favor of BMO Harris and against IDOR and the State of Illinois on its Amended Adversary Complaint, and judgment shall be entered against IDOR and in favor of BMO Harris on its counter-complaint. The Cross Complaint of IDOR is rendered moot.

A separate order shall be entered giving effect to the determinations reached herein.

Date: March 30, 2016

_____
Thomas M. Lynch
United States Bankruptcy Judge